## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

TERRY GLENN GOODMAN, JR.,

      Plaintiff,

v.                                    CIVIL ACTION NO. 1:20-cv-00777

KILOLO KIJAKAZI,[1] Acting
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Terry Glenn Goodman, Jr. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on December 2, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Plaintiff's Brief in Support of His Social Security Appeal (ECF No. 9) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 10).

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    *BACKGROUND*

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 25 years old at the time of his alleged disability onset date and 39 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 437.)[2] He completed one year of college. (*Id.* at 432.) Most recently, he worked as an overnight stocker at a retail store, and he has also been employed as a security guard. (*Id.* at 433.) Claimant alleges that he became disabled on July 18, 2006, due to cervicalgia, a thoracic lumbar strain, degenerative disc disease, a traumatic brain injury, optical nerve damage, nerve damage, a testicle injury, cervical bone spurs, arthritis, and bilateral macular degeneration. (*Id.* at 431, 437.)

Claimant protectively filed his application for benefits on April 24, 2019. (*Id.* at 406–10.) His claim was initially denied on June 10, 2019, and again upon reconsideration on August 29, 2019. (*Id.* at 321–25, 331–39.) Thereafter, on September 12, 2019, Claimant filed a written request for hearing. (*Id.* at 340–41.) An administrative hearing was held before an ALJ on February 21, 2020, in Bluefield, West Virginia, with the ALJ appearing from Columbia, South Carolina. (*Id.* at 249–302.) On April 15, 2020, the ALJ rendered an unfavorable decision. (*Id.* at 8–26.) Claimant then sought review of the ALJ's decision by the Appeals Council on June 15, 2020. (*Id.* at 397–400.) The Appeals

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.

Council denied Claimant's request for review on September 30, 2020, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id.* at 1–7.)

Claimant timely brought the present action on November 30, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  The Commissioner filed an Answer (ECF No. 6) and a transcript of the administrative proceedings (ECF No. 7).  Claimant subsequently filed his Plaintiff's Brief in Support of His Social Security Appeal (ECF No. 9), and in response, the Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 10).  As such, this matter is fully briefed and ready for resolution.

### B.  Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1.  Treatment for Back Pain and Headaches During Relevant Period

On October 23, 2006, about three months after his alleged onset date, Claimant presented to a Department of Veterans Affairs ("VA") medical center and complained of "cervical and thoracic back pain" resulting from an injury he suffered in 2004 while in active military service.  (*Id.* at 612 (emphasis deleted).)  Upon physical examination, Claimant had limited range of motion in his cervical spine and paraspinal muscle soreness to palpation, but his range of motion in his upper extremities was normal.  (*Id.*)  He was given a six-week at-home physical therapy exercise program but declined to schedule regular physical therapy appointments.  (*Id.*)

Almost six months later, on March 6, 2007, Claimant again presented to the VA, still complaining of "[p]ain in the midback and the neck."  (*Id.* at 607.)  He stated that he

3

had previously been treated with medications, epidural steroid injections, and physical therapy, but none of them provided relief.  (*Id.* at 607–08.)  A physical examination was largely normal, except the neurologist noted that Claimant "had fairly good strength in all extremities except for slightly reduced effort in the right upper and lower extremity" and "tenderness to minimal pressure over the skin in the midcervical paraspinal region as well as in the midthoracic region" and "paraspinal muscle spasm or deformity."  (*Id.* at 608.)  The neurologist assessed Claimant with a "T4 hemangioma" based on spinal imaging and reasoned that it "is likely a benign lesion that is generally asymptomatic."  (*Id.*)  He also stated that Claimant's "pain seems to be suggestive of myofascial pain syndrome, likely exacerbated by underlying [post-traumatic stress disorder] and depression," and he remarked that Claimant refused recommended treatment with narcotics.  (*Id.*)

Two months later, on May 17, 2007, Claimant consulted a neurosurgeon at the VA about his back and neck pain and headaches.  (*Id.* at 606.)  Imaging was "essentially negative," revealing "a possibility of a very small disc bulge at the C5-6 [vertebra,]" "a hemangioma at the T4 [vertebra]" and "some early degenerative disc disease" in Claimant's thoracic spine.  (*Id.* at 607.)  Surgical intervention was not recommended. (*Id.*)

Claimant also had a physical medicine and rehabilitation consultation at the VA on July 31, 2007.  (*Id.* at 601.)  He reported neck pain, pain and numbness in the right side of his body, and "thoracic back pain with radiation to the ribs."  (*Id.*)  The physician noted that Claimant "became shakey [sic] on [physical] exam which he relates to pain," and he had somewhat decreased spinal range of motion and "[m]ultiple myofacial [sic] trigger points."  (*Id.* at 602–03.)  The physician recommended medication, trigger point injections, and stretching.  (*Id.* at 603.)  He also remarked that Claimant "exhibits some

symptom amplification and gives a very non-anatomic description" of his symptoms, which "suggests somatization as a significant component of his pain." (*Id.* at 604.) He recommended counseling and anti-depressant medication. (*Id.*)

Imaging of Claimant's thoracic spine performed almost a year and a half later, on December 22, 2008, revealed "[s]table findings, to include early, mild lower level intervertebral osteochondrosis, and a T4 vertebral body lesion compatible with a hemangioma." (*Id.* at 643.) A brain scan from the same day was "unremarkable" aside from paranasal cysts in the sinuses. (*Id.*)

On September 21, 2011, several years since he was last treated, Claimant presented to the VA and requested imaging of his "neck and thoracic spine" because he was experiencing neck and shoulder pain. (*Id.* at 620.) The physician explained that he had previously referred Claimant to a pain clinic "but he failed to show for the appointment," and Claimant refused another referral to a pain clinic or physical therapy. (*Id.*) A physical examination was normal aside from "[d]iminished range of motion due to pain" in the neck. (*Id.* at 621.) The physician ordered the imaging Claimant requested and instructed him to continue using a heating pad and over-the-counter medications for his pain. (*Id.* at 622.) The imaging of his cervical spine revealed "[m]inimal degenerative changes" and "[r]elatively minimal findings," and the imaging of his thoracic spine revealed "[n]o significant degenerative changes" and "[l]imited abnormalities with little if any significant interval change." (*Id.* at 641–42.) A brain scan from December 19, 2011, was negative. (*Id.* at 640.)

Several months later, on February 29, 2012, imaging of Claimant's lumbar spine revealed "[d]isc space narrowing at the L5 S1 level." (*Id.* at 639.)

On April 10, 2012, Claimant presented to the VA for a pain management consultation. (*Id.* at 589.) He continued to complain of neck and right upper extremity pain and pain between his shoulder blades. (*Id.* at 590.) Although he reported that his medication helped the pain, he told the physician that "he is not happy taking [narcotics]." (*Id.*) Upon physical examination, Claimant had full muscle and grip strength in his bilateral upper extremities, and his "[s]houlder range of motion [was] not restricted." (*Id.*) He was diagnosed with a parathoracic muscle spasm, degenerative disc disease, and facet joint arthrosis of the cervical spine. (*Id.*) The physician recommended occipital nerve blocks, trigger point injections, and medication, and he also advised Claimant "to be more active." (*Id.* at 591.)

Claimant presented to the VA on November 6, 2012, and endorsed neck and back pain, headaches, dizziness and balance issues, and cognitive difficulties. (*Id.* at 577–78.) A physical examination was normal aside from "[m]yofacial [sic] pain in [bilateral trapezius muscles] and levator scapulae" and a slow, antalgic gait. (*Id.* at 578.) The physician recommended electrotherapy for Claimant's headaches and physical therapy for his pain because he indicated that he wanted "to avoid medications." (*Id.* at 579.) Claimant had a physical therapy consultation on December 3, 2012. (*Id.* at 575.) A physical examination revealed tenderness to palpation along the spine and paraspinal muscles and painful range of motion in the cervical spine and hip. (*Id.* at 575–76.) The physical therapist performed electrotherapy, and Claimant stated that he "was pleased with the headache relief." (*Id.* at 576.) The physical therapist recommended once-weekly sessions for four weeks and at-home electrotherapy and exercises. (*Id.*)

Imaging of Claimant's lumbar spine performed on February 15, 2013, revealed "[t]race facet arthropathy" but was "otherwise normal." (*Id.* at 639.) On February 27,

2013, he presented to the VA for a physical medicine and rehabilitation consultation. (*Id.* at 573.)  He again reported spinal pain and stated that physical therapy improved his mobility but not his pain, but the electrotherapy provided good results. (*Id.*)  Upon physical examination, Claimant had "[p]ositive tender points to over 11/18 fibromyalgia points," mostly in "the neck and hip regions." (*Id.* at 574.)  The physician surmised that Claimant's "symptoms were more consistent with either fibromyalgia, myofacial [sic] pain, depression, [post-traumatic stress disorder], or possibly centeral [sic] pain syndrome." (*Id.* (emphasis deleted).)  He recommended that Claimant see his primary care provider for fibromyalgia medication that "could also help with depression." (*Id.* (emphasis deleted).)

On October 8, 2014, weeks before his date last insured, imaging of Claimant's cervical spine revealed "[m]ild multilevel degenerative disc and facet disease" and "[m]inimal degenerative changes." (*Id.* at 634, 636.)  Imaging of the thoracic spine revealed "[v]ery mild degenerative changes." (*Id.* at 635.)  And imaging of the lumbar spine again revealed "[d]isc space narrowing at the L5-S1 level" but "[n]o significant degenerative change." (*Id.* at 635, 637.)

### 2. *Mental Health Treatment During Relevant Period*

About four months after his alleged onset date, on November 28, 2006, Claimant presented to the VA for an evaluation of his depression and post-traumatic stress disorder. (*Id.* at 609.)  Upon mental status examination, the physician's assistant observed that Claimant was "alert and attentive" and fully oriented but appeared "agitated" and did not talk much. (*Id.* at 611.)  He had a "depressed" mood with a congruent "blunted/restricted/constricted" affect but no perceptual disturbances or suicidal or violent ideation. (*Id.*)  While his thought processes were normal and coherent,

he had limited insight, "impulsive" judgment, and impaired recent and remote memory. (*Id.*) The physician's assistant recommended medication, but Claimant refused medication and requested a referral to a counselor. (*Id.*)

Claimant presented to a neuropsychologist at the VA for an evaluation on August 16, 2007. (*Id.* at 593.) Her neuropsychological testing revealed that Claimant had average global cognitive ability "with particular strength on non-verbal measures," average reading and math skills, "albeit somewhat lower than expected given his performance on a measure of global cognitive ability," average motor speed and dexterity that was "below expected levels," borderline impaired auditory learning abilities but high average visual learning abilities, and average "performance on measures of auditory and visual memory, verbal fluency, and attention/concentration." (*Id.* at 595–96.) However, she noted that Claimant's "[e]motional functioning is an area of concern at this time." (*Id.* at 596.) She diagnosed Claimant with major depressive disorder and post-traumatic stress disorder and "strongly recommended" that he pursue "[a] combination of psychotherapy and medication management." (*Id.*) Claimant later told the neuropsychologist that he "does not feel the need for psychotherapy at this time" because his divorce had been finalized and "he feels a relief." (*Id.* at 592.)

More than five years later, on October 18, 2012, Claimant presented to the VA for a mental health intake evaluation. (*Id.* at 579.) He related that he "is having a hard time managing his emotions, feels depressed much of the time, has feelings of being overwhelmed and increased irritability and anger." (*Id.* at 580.) A mental status examination was largely normal. (*Id.* at 588.)

### 3.  *Vocational Expert Hearing Testimony*

During the administrative hearing, the ALJ heard testimony from a vocational expert ("VE"). (*Id.* at 291–300.) The ALJ first confirmed that Claimant had no objection to the VE's qualifications to testify and that the VE had not spoken with the ALJ or Claimant prior to the hearing and could give impartial testimony. (*Id.* at 291–92.) She then asked the VE to classify Claimant's past work, and after some clarification questions, the VE stated that Claimant had previously worked as a dispatcher, a stores laborer, and a security guard. (*Id.* at 295–97.)

Next, the ALJ asked the VE to imagine a hypothetical individual with Claimant's age, education, and past work experience who "would be limited to medium work" and "could only occasionally climb ladders, ropes, or scaffolds" but "could frequently perform other postural movements" and "could not work at unprotected heights or near unguarded moving machinery." (*Id.* at 297.) She also specified that the hypothetical individual "could work in an environment with a maximum noise level of moderate" and "could not perform customer service based work." (*Id.*) When asked whether the hypothetical individual could perform Claimant's past work, the VE testified that the hypothetical individual would be capable of working as a stores laborer but could not work as a security guard or a dispatcher because they "are working with people." (*Id.* at 297–98.) The ALJ also asked if other unskilled work would be available for the hypothetical individual, and the VE testified that he could work as a hospital cleaner, linen room attendant, or counter supply worker. (*Id.* at 298.) The VE represented that his testimony was consistent with the *Dictionary of Occupational Titles*. (*Id.*)

The ALJ then asked the VE to imagine a second hypothetical individual with the same limitations as the first, except the second individual would also be "limited to

occasionally pushing, pulling with his bilateral upper and lower extremities." (*Id.* at 298–99.)  When she asked if this additional limitation would change the VE's previous testimony, he answered in the negative.  (*Id.* at 299.)

The ALJ asked the VE to imagine a third hypothetical individual with the same limitations as the second hypothetical individual, except the third would be limited to light work with "occasional postural movements." (*Id.*)  The VE testified that the third hypothetical individual would not be capable of performing Claimant's past work, but could do "alternative work" as a garment sorter, housekeeping cleaner, or office helper. (*Id.*)  The ALJ again asked the VE if his testimony was consistent with the *Dictionary of Occupational Titles*, and he replied that it was.  (*Id.* at 299–300.)

Finally, the ALJ asked the VE, "What if with any of the past three hypotheticals I gave you, this person was further limited to simple, routine tasks?  Would that impact your testimony at all?" (*Id.* at 300.)  The VE responded, "No, it would not, including the answers on the past work." (*Id.*)

The ALJ also gave Claimant's counsel an opportunity to question the VE.  (*Id.*)  Claimant's counsel first asked the VE to "add[] to the [ALJ's] hypothetical that the individual was only capable of productivity for . . . one-third of their work shift and they would also need to frequently call out of work." (*Id.*)  The VE testified that these additional limitations would change his previous answers, elaborating, "anything more than 15% of the time off task for any reason at all would preclude work.  And frequently calling out, anything more than one day per month on a consistent basis . . . would preclude work." (*Id.*)

### C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant."  *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."  20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other

evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."   20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in

13

the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant "last met the insured status requirements . . . on March 31, 2014." (Tr. at 13.) She further determined that Claimant "did not engage in substantial gainful activity during the period from his alleged onset date of July 18, 2006 through his date last insured of March 31, 2014." (*Id.* at 14.) She found that Claimant's degenerative disc disease of the cervical, lumbar, and thoracic spine, neuropathy, fibromyalgia, major depressive disorder, post-traumatic stress disorder, and traumatic brain injury with vision changes and headaches constituted "severe" impairments. (*Id.* at 14–15.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 15–17.) Upon assessing Claimant's RFC, the ALJ determined that "through the date last insured, the claimant had the [RFC] to perform medium work . . . except he [could] occasionally climb ladders, ropes and scaffolds" and "frequently perform other postural movements" but "could not work at unprotected heights or unguarded moving machinery" and could "work in an environment with a maximum noise level of moderate." (*Id.* at 17.) She also found that Claimant "could not perform customer service based work" and was "limited to simple, routine tasks." (*Id.*)

The ALJ concluded that given the limitations imposed by Claimant's RFC, he was capable of performing his past relevant work "as a storage laborer as actually and generally performed." (*Id.* at 21.)  She also found that "there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed." (*Id.* at 22.)  To that end, she noted that Claimant was "a younger individual" with "at least a high school education" on his date last insured and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*)  Because she determined that he was unable to perform the full range of medium work, she enlisted a VE to aid in her finding that Claimant was capable of working as a hospital cleaner, linen room supply worker, or counter supply worker. (*Id.*)  As a result, the ALJ concluded that Claimant "was not under a disability . . . at any time from July 18, 2006, the alleged onset date, through March 31, 2014, the date last insured." (*Id.* at 23.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the ALJ erred by not adopting the limitations that his counsel posed to the VE during the administrative hearing. (ECF No. 9 at 1–2.) He also asserts that the ALJ failed to properly acknowledge the VA's determination that he is disabled. (*Id.* at 6–7.) Claimant asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 7.) The Commissioner responds that the ALJ was not required to give any weight to the VA disability determination and that she fully considered Claimant's medical records from his treatment at the VA clinic. (ECF No. 10 at 9–11.) She further argues that the ALJ need only rely on the VE's testimony as to credibly established limitations. (*Id.* at 11–13.)

#### A.  *VE Hypotheticals/RFC Assessment*

Claimant first contends that the ALJ should have accepted the VE's testimony that no work would be available for an individual who "would only be capable of productivity one-third of the work shift" and "would need to frequently call out of work." (ECF No. 9 at 1–2, 5.) He asserts that these restrictions are "much more consistent with the limits imposed by the pain experienced . . . from his spine condition, the headaches imposed by the traumatic brain injury and the depressive symptoms caused by the Post-Traumatic Stress Disorder and Major Depressive Disorder." (*Id.* at 5.)

The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record." *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)). The ALJ may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence." *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL 1759741, at *6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief v. Berryhill*, No. 5:16-cv-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017), *adopted by* 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017)); *see Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at *2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact").

To that end, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)). Therefore, the undersigned **FINDS** that Claimant's insinuation that the ALJ was automatically required to adopt the limitations set forth in his counsel's hypothetical questions to the VE is without merit.

Claimant instead seems to argue that the ALJ's RFC assessment does not adequately reflect his functional abilities. (*See* ECF No. 9 at 5.) "In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). This entails "identify[ing] the individual's functional limitations or restrictions and assess[ing] his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (internal quotation marks omitted). The RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

She did so in this case. After describing Claimant's subjective complaints, the ALJ began her RFC assessment by recounting the "diagnostic imaging" performed during the relevant period, and she determined that Claimant "has some degenerative changes in his cervical, thoracic and lumbar spines which support [him] having some restrictions with use of his back" but "do not support the alleged level of [his] symptoms and functional limitations prior to [his] date last insured." (Tr. at 18–19.) She then summarized his

18

treatment records for his physical and mental impairments. (*Id.* at 19–20.)  The ALJ concluded,

> Claimant's records do show that he had some abnormal physical and mental status examination findings that support [him] having some limitations. Physically, these include pain throughout [his] back[] and multiple myofascial tender points.  However, [he] had full strength in his bilateral upper and lower extremities.  Straight leg raise testing was negative. Claimant was not noted to have an ataxic gait until November 2012, and then he still had a good arm swing and no foot drag.  Mentally, [he] was depressed with a blunted/restricted/constricted affect.  He had limited insight and judgment and an impaired memory.  However, [his] speech was normal.  In 2012, [his] mood and affect were normal.  He was consistently oriented to person, place and time, and by 2012, his memory had improved to intact.  This all supports that [he] could have some limitations, but not to the alleged level of symptoms and functional limitations.

(*Id.* at 20–21.)

Notably, although Claimant asserts that his physical and mental impairments cause the limitations in the hypothetical questions his counsel asked the VE, he points to no evidence demonstrating that those limitations exist.  (ECF No. 9 at 5.)  "[A] diagnosis is insufficient to prove disability—rather, there must be resultant functional limitations precluding a claimant's ability to work." *Smith v. Berryhill*, No. 3:16-cv-11868, 2018 WL 3800039, at *9 (S.D.W. Va. July 17, 2018) (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)), *adopted by* 2018 WL 3795277 (S.D.W. Va. Aug. 9, 2018).  Claimant bears the burden to demonstrate that the RFC assessment does not accurately reflect the

restrictions he requires.  *See Okes v. Berryhill*, No. 1:16-cv-08976, 2017 WL 4003028, at *5 (S.D.W. Va. Aug. 11, 2017), *adopted by* 2017 WL 3996419 (S.D.W. Va. Sept. 11, 2017). He has not met it here.  As such, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

### B.  *VA Disability Determination*

Claimant also argues that the ALJ did not adequately defer to the VA's determination that he is disabled and failed to consider his treatment records from the VA.  (ECF No. 9 at 6–7.)  Turning first to the former argument, the regulations applicable to this case explain, "Because a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the ALJ] and is not [the ALJ's] decision about whether [the claimant] is disabled or blind under [the Social Security Administration's] rules."  20 C.F.R. § 404.1504.  The ALJ is thus not required to analyze "a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id*.  Consistent with these instructions, the ALJ in this case reasoned that the VA disability determination was "not binding on this proceeding" and was "not persuasive."  (Tr. at 21.) The undersigned **FINDS** that the ALJ did not err by concluding that Claimant was not disabled despite the VA's earlier determination that he was.

The latter argument Claimant makes is also meritless.  Although the ALJ is not obligated to adopt a disability finding made by another governmental agency or a nongovernmental entity, she must nonetheless "consider all of the supporting evidence underlying [that] decision" that is part of the administrative record before her.  20 C.F.R. § 404.1504.  She did so in this case, meticulously summarizing Claimant's treatment notes

for the relevant period, all of which came from the VA.  (Tr. at 18–21.)  In an indirect way, Claimant asserts that she reached the wrong conclusions from this evidence, "but it is not this Court's role to reweigh conflicting evidence or substitute its judgment for that of the ALJ so long as '[her] decision is supported by substantial evidence.'"  *Cook v. Colvin*, No. 2:15-cv-07181, 2016 WL 5661348, at *8 (S.D.W. Va. Sept. 29, 2016) (quoting *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).  The undersigned has already explained that the ALJ's RFC assessment is supported by substantial evidence.  As such, the undersigned **FINDS** no error.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: September 3, 2021

Dwane L. Tinsley
United States Magistrate Judge